Good morning, and welcome to the case of the court. My name is Jesse Krebs and I represent Taylor Farms Pacific. The appellant in this case, I've asked to split my time this morning with Ms. Tillman, who represents Eagle, Mendoza, Inc. So I will be speaking for 11 minutes, Ms. Tillman will be speaking for 2 minutes, and I'd like to reserve 2 minutes of our time for rebuttal. At its core, this is a meal break case, and under Brinker v. Superior Court, companies are not required to force meal breaks on their employees. In fact, employees have flexibility to take those breaks whenever they want. They didn't need it to get them all together. So under Brinker, the ultimate question in this case is not when someone actually took a break or whether they took a break. The question is whether the individual was given the opportunity to take that break. Here in certifying the class, this report relied on two pieces of evidence, neither of which provides the answer to that fundamental question under Brinker, certainly not on a class-wide basis. I'd like to address each of those pieces of evidence in turn, the first of which And you said two pieces, I thought that the Supreme Court relied on three pieces of evidence. I thought she relied on the handbook, I thought she relied on the exhibit number 17, and I thought she relied on the declarations. Well, they all address all three of them. I just wanted to make sure. Fair enough. I'll start with exhibit 17. Exhibit 17 itself is a document that comprises more than 9,000 pages. It contains more than 500,000 calculations, and indeed the district court was described by the plaintiffs as a, quote, analysis. And yet, in that document, it contains life relations, successes, liability, we have no names, no dates, no employee ID numbers, no such times. We don't know who these employees are, what departments they worked in, whether they worked alone or in groups with a supervisor, or without how they compared to others, and no information about the methodology that was used to put it together. And yet the district court relied on that as the cornerstone of a certification decision without applying any evidentiary scrutiny to that policy, under Ellis v. Scott. It seems like a discussion that did take place on this spreadsheet itself, but it seemed evident on what was going on there when you look at the different times, the columns, and the raw data. And you all probably have, or, you know, your mind has a position of your reference, claims that there are over 9,400 instances of missing second meal breaks during this class period. Did you, and I don't recall, did you submit any rebuttals, any rebuttal, any data observed additives? How did you do it? What did they submit? The time records themselves are not in evidence at all. We did not provide a summary of any time records. In fact, there's no evidence of time records in this record. And I understand your Honor's point, and if I could address it, I think there's really two problems with it. One is the fundamental foundation and reliability of that evidence. I think it's clear that both under Ellis v. Costco and under Marlowe v. UPS, that there is a reliability standard that applies under Ellis v. Costco. A Daubert standard should have been applied to that evidence. But even under Ellis v. Costco. Maybe, perhaps for my purposes right now, that Daubert doesn't apply. Understood. Even in Marlowe v. UPS, this court reached the same conclusion as to not have expert evidence. The evidence in that case focused on an employer survey that was not expert evidence. The court focused on the fact that there was no evidence that it was both probative and reliable. Because there was no evidence as to what group of employees were at issue and the evidence how those people were selected, what the methodology was at all. In fact, all we need to look at in the document itself to determine if there's any condition of reliability is the very first entry in which counsel for the plaintiffs had said, well, all you have to do is add column 1 plus column 2 and it equals column 3. We know from looking at the face of the document itself that that's simply not true. But even beyond the reliability of the document, the document itself, the time records themselves don't answer the fundamental question of whether or not they were provided the opportunity to take a break. And under a column cast, it just doesn't work to rely on the time records at all because there's a disconnect between what the evidence itself shows and what ultimately the plaintiffs are going to have to prove at a trial. Plaintiffs, of course, have realized they know on appeal, and they originally said to the district court, this shows evidence of a violation. Now, in this court, they said it doesn't show evidence of a violation. But we think that it's enough to shift the burden to the employer to demonstrate that somebody was off the calendar, do they need to take a break. I think that suffers from a number of problems, the first of which is that argument was never raised below. It certainly isn't the basis of the district court's order. Two, there's no evidence of burden shifting in the statute itself. I know that the California legislature, to the extent it intends to shift the burden, can write that into the statute. We've seen that in the labor code before. That's not here. And three, it runs counter to Brinker itself. In Brinker, the play of Brinker, in the majority opinion, was that employees have flexibility under the labor law, under the labor code, to take breaks when they want and how they want. It also said something very important. It said that employees cannot, quote, manipulate that flexibility through close viability on an employer. So what we only need, for example, to look at an employee who could manipulate the flexibility by choosing then to take a break five hours and one minute into their shift consistently and on purpose, and then three years later, turn around and sue their employer to demonstrate and try to force that employer to demonstrate that they were given the opportunity to take a break two minutes earlier. And that's not what Brinker contemplates. It's certainly not what the majority contemplates. It doesn't eliminate the individual questions that would be required. And I'll give you a perfect example. And this gets into the handbook itself. I would say, well, we can bridge that gap with the handbook. The problem with that is the handbook itself is silent, for example, on second meal breaks. But we know from Thomas Morris, and this comes directly from the district court's order, that he says he always got his second meal breaks and that the company didn't follow the handbook. He also says... He did offer declarations to counter the declarations that did come in. And so, I mean, it seems like there's going to be, you know, always variations in the way employees take their lunch breaks. But here, I would like to address, you know, whether there's an unlawful written policy coupled with employee declarations. You know, at least 30, I think, was the count, and timesheets showing missed meal breaks. I guess, why can't that prove that a common question predominates? Well, I think, ultimately, what this court said in its list is not that there's evidence of violations, but where with the evidence has to be that, quote, the entire class is subject to the same practice, end quote. And then it talked about a policy that, quote, affects the class as a whole, and it puts that term as a whole in italics. And so, the question is not whether a declaration was submitted from some people who said that they may not have been offered their breaks, because we know from the police... But if you look at that, there's a number of instances, though, that occurred in the fact that the handbook policy was not correct or certainly deficient. You know, why isn't that enough? Well, I think... I'm not saying that every employee had to submit a declaration. I'm not saying that they had to show every employee's time card. I mean, it seemed like there was some agreement that there was going to be or what the company gave them was certain alphabet numbers of certain employees, and that's all they were to work with. Right. And I'm not saying that every employee needs to submit a declaration, but what I'm focused on is what this court focused on in Ellis v. Costco is a common thread that runs across all of the employees. And we know from just looking at the name plaintiffs themselves, on page 42 of the district court's class certification order, we know that there are stark differences among case and name plaintiffs in terms of their experiences. The district court itself said that the handbook, there was no evidence that the handbook was actually used. It said on page 45 that the court is not located, and, obviously, that's not provided any discipline by the fugitive class member that can't be implemented. The policy obtained required bail-and-respite teams not be to step forth in its policy. And so that handbook, if it's not implemented under Marlow and under Wells Fargo, under this court's standard, doesn't provide the evidence. The blue is the classical hole. And if you look, for example, at Cliff Morris, he says, there was nothing that prevented him from taking his break before the five-hour mark. On page 22 of the class certification order, Plaintiff Taylor said when she worked in housekeeping, all of her breaks were compliant. And in the fruit-and-tomato room, she didn't have an issue with taking breaks five hours at the beginning of her shift. Plaintiff Taylor's laws didn't have a five-hour issue. Those are the findings of the district court. Below, on the nameplates alone, in the handbook itself, does it answer the question as to those individuals, because, one, it wasn't implemented, and, two, it doesn't reflect the realities of their experiences. And, two, the time records themselves don't demonstrate when those people were actually offered the opportunity to take a break. There is no clue holding this massive 4,000-person class together. I see it at the four-minute mark. I promise to turn my time over to Ms. Tillman. Good morning, founders. I will be brief. My name is Christina Tillman. I'm with McCormick Barstow, and we have a paper with a dozen ink. And I wish to address only the portion of the court's order that relates to applying this common policy on the handbook as to ablement doses. The court relied on both. The handbook policy, which it acknowledged, as Mr. Cooke stated, was not put into practice exactly based on the data, which is problematic, as Mr. Cooke stated, and I won't get into. But when you look at this policy, it states that three-hour periods are provided after six hours. Ms. Pena is the only named plaintiff who worked for ablement dosing ink, and the excerpts from her current volume four show Ms. Cooke, three missed meal periods, or excuse me, three meal periods after the five-hour mark taken by Ms. Pena. Two of those three were at five hours and 12 minutes. And the testimony of Ms. Pena is that she always received a timely meal period at the five-hour mark. So when you look at the practice of the named plaintiff for ablement dosing ink, it does not corroborate the handbook policy of not being provided a meal period until the sixth hour of work. So to the extent that the record shows that nobody from ablement dosing ink saw this handbook, that they were trained on the handbook, the handbook applied to them, and the data being relied on does not corroborate that that practice relates to ablement dosing ink, then coordinating, granting such status to ablement dosing ink and finding commonality and predominance. Why do you all have a handbook? Why do you have a handbook? Do you have a particular part of your work? Why do they have a handbook? Same reason everybody has a handbook. You establish practices in theory. But when you're working with a farm labor contractor and you don't share those practices, and when they have ablement dosing ink because it's unsupervised or something, it's on the board, then so you're just saying the contractor you represent didn't follow through with the handbook. We didn't receive the handbook, or we received it, but did not distribute it. And I promise to have this checked out for everybody else. Thank you. Good morning. May I have a place in court? My name is John Bickford, and I represent the plaintiffs in the tentatively certified class. This case was about Exhibit 17. This appeal was about Exhibit 17, and their attacks on Exhibit 17. They're citing that it's expert testimony, and the only thing they can do to claim that it's expert testimony is they say that lawyers are bad at math. When you go and you look at this exhibit, you can see all he did is simply add, omit, and subtract, and count up violations. This isn't something that took some technical expertise. Yes, it was a little bit, but that's what Excel was for, and that's what we did. Explain your methodology, and then tell me if you thought you explained it the best you could at the district court. No, we did not explain it the best we could. It could have been presented better, and we would have avoided this entire situation. If you want to look to whether or not they were right. The fact that you didn't explain it better, why doesn't that affect the methodology here and your ability to win this case? Well, Taylor Farms has the actual time records. I have the actual time records right here. And if you look at what's going on, this first line on the first page, 4 hours and 36 minutes, that's the amount of time from when they clocked in to when they took their first break. Their break duration was 25 minutes. They then clocked back in and worked for an additional 4 hours and 41 minutes. That's a total shift time of 9 hours and 42 minutes. At that point, it's simply counting it all up. Taylor Farms, again, this isn't in the record, but Taylor Farms has the actual time records in order. The first three lines of those can corroborate that perfectly. If this person's start time is at 7 o'clock, the end time was at 11, or he clocked out for his first break at 11 minutes, assuming 11 hours and 36. And that equals 4 hours and 36 minutes. And I could continue doing this. It was all done via Excel. But you're saying that's what you did. That's not information to the district court. That's correct. That is what we provided to the district court. Boy, do I wish that we had hired an analysis and paid money and done all that, and we wouldn't be here today. Because I don't think, even if their objections had merit here, that we would be in that position now, because it was an easy lending to deflect that. That is what we used to show that the handbook reflected, quote, the realities of the workplace, which is what this court held.  So let's look at actually the commonality and the predominance, for reasons that the district court spent many, many pages analyzing. First, the court said you need at least one common question. It must be an important question that resolves an issue central to the case. The court then analyzed our theory of the case, which was that their written handbook was facially unlawful. The court said, yes, preliminarily, this looks to be facially unlawful. And then the court says, okay, the common question predominated. Now we have to look at the common question predominated. First, the district court looked at the declarations both sides submitted. And as is very, very typical in class certification briefing, our declarants' opponents said, yes, there were violations at the end. The defendant said, no, everything was fine, and we can solve this as it was happening. So it was conflicting. At that point, the court then looked at our summary and said, well, because this is conflicting testimony, it looks like the actual time record to release this preliminary summary supports what the policy is saying. It reflects the realities of the workplace. Now they try to say, oh, well, the handbook was never distributed. We didn't follow our own handbook. Well, that's not true. I mean, this was the only document, and it adds to the record, is that the Abel Mendoza brief is 302 to 303 and 307 to 310. That states this was the only document used to train supervisors. I believe the document was also available in the break room. At least the Tiagar Farms employees received the document. Abel Mendoza's employees did not receive the handbook, but the supervisors supervising them in Abel Mendoza did. And, therefore, all of the actions were taken within the confines of the policy. As Ben has just pointed out, that there were instances where people did get their briefs, as will always be the case. Simply because a lawful policy is in perfect and not perfect violations doesn't mean it wasn't implemented. In fact, on page 22, the court. But does that not support that individual decisions predominate versus common? Well, the court said that the individual issues can be managed in time records. So if we set forth a trial plan in stage one, we're going to determine whether an unlawful policy existed, whether it was implemented, right? That's going to rely on the time records and the handbook, additionally with deposition and live testimony, showing that this is what was happening. The jury will be asked to determine, did they have an unlawful policy? Essentially, did they follow their own handbook? If the answer is yes, we then turn to the damages phase, which can be individualized. The time records will start with the presumption that these breaks were violative. And at that point, we engage in this individual inquiry as to the damages, as to how much their policy, which we've already determined existed in stage one, how it affected them. Now, I want to note, they don't address, they did a lot about addressing the first meal period. Some people took it on time, some people did not. When it comes to the second meal period, it's my understanding that is an extremely high violation. We have 98,000 examples. That cooperates almost perfectly. Additionally, and this is something district courts frequently rely on, is the lack of evidence of there ever being premiums being paid. When an employer fails to provide a rest break or fails to provide a meal break, they must pay premium pay, which is one hour of pay. That's not a wage, but it's the compensation for not providing your employee with a break. So essentially, you don't have to give your employees breaks, but you do have to pay them additionally one hour for the non-provision. That allows the employer some flexibility. In this case, we have no evidence that that ever occurred. So despite the fact that they have all the time records and they could have cooperated, Exhibit 17, and it's my understanding, I don't think they actually disputed numbers, there's no evidence that any of those 98,000 second meal periods were ever accompanied by a premium pay. There's no evidence that any of those late first meal periods were cooperated by a premium pay. Excellent. Everyone just couldn't respond to their arguments. They don't have names. They don't know. They're challenging the methodology in the Exhibit 17 by a number of questions. Can you respond to that? Sure. As I stated before, this could have been presented better. We could have provided additional information. It may have been just we ran a rule because we have the records. But they know that Taylor Farms knows what records they produced to us. I have the very beginning of them right here, and they could have looked at the very first three lines and determined the very first shift. It confirms it right here. And that's not only shown by their ability to do so, but that they didn't come back and say, well, no, if we analyze our own time records, then you're wrong. Instead, it was a scattershot of objections. If you look at their objections to the evidence, we submitted in support of class certification. Every single piece of evidence was objected to. For example, we submitted the handbook, and they objected saying, well, Mr. Downey, the person who signed the declaration, doesn't have knowledge that this is the handbook, and therefore the handbook hasn't been properly authenticated. This was what we were dealing with, and we had the same problem here. This has stuck a little more because we're obviously here now. And like I said before, I wish we had presented this better, and we wouldn't be in this position. But the data will show what the data will show. When we go to trial, and we stated this in the brief, this summary will never be presented. Because when we go to trial, we're going to request all the time records, not just the Khronos time records, which are in this electronic format, but also the handwritten records. At that point, we'll have to probably code them using someone else into electronic, and we're going to come up with a spreadsheet for every single shift, a summary of every single shift. And that is the evidence which is going to be submitted to the jury. Now, the court stated twice in its order that defendants are free to challenge the admissibility of those time records come trial. And just like the United States Supreme Court decision in... It was in the Zidane and Duffy case in 1966. It's steaming my mind. But in that case, they said that they could challenge the admissibility of the data at trial. And if for some reason we can't get a summary of time records, we're going to be in a tough position. But they have the ability to do that, and they have the ability to challenge at that time. Again, this will never be produced again. This is never done. This is just for the purpose of class certification. Just a few more quick points. They talk about Daubert. And again, it's our position that this is not an expert testimony. It's simply counting using Excel. But it's their position that Daubert applies to the class certification stage. Or more specifically, they attack the district court's statement that evidence must be admissible at trial, at class certification. The court said, no, not all evidence must be admissible at trial. And that makes sense. For example, most of the evidence that's presented in a class certification motion in opposition is submitted in the form of declarations that contain hearsay. If we were to adopt a rule that all evidence must be submitted, must be admissible at trial, at or by certification, well, then we'd have to start presenting live testimony. We wouldn't be able to rely on our applications in the plea. We'd be making ultimate merits determinations. And that's not the purpose of class certification. The purpose of class certification is solely to determine whether class treatment is the best method for adjudicating this claim, whether it's a feasible and manageable method to do so. In certifying this class, the district court retains the discretion to decertify the class should it become apparent that it becomes unmanageable to do so. Another reason why we shouldn't adopt the at-trial admissibility standard is Rule 23 requires class certification to be made at the earliest practical stage, which sort of becomes a game in the trial court of defendants wanting to move as quickly as possible and us trying to get as much information as possible prior to we move. But if we were to have to show that all the evidence we submit in support of class certification be admissible at trial, well, again, that's going to turn it into a mini-trial on the merits side. Now, here's how I'll pollute. If the timesheet shows that an employee missed the second meal period, how would you determine whether the missed meal was the result of the policy or an employee's individual choice? Well, that would be up for the jury to decide. Again, we're going to do the phase. We envision it into phases. The first phase, we will ask the jury or the class finder to just determine whether it was an unlawful policy and whether that policy reflected the realities of the workplace. Then we start with our baseline damages for each individual employee. Yes, when we get to the individual aspect of this case, there's going to be some, I mean, I don't know what evidence they're going to submit to rebut the presumption, but I assume they will try to do so. But that's already after we've determined they implemented an unlawful policy. And that makes sense. We shouldn't allow a defendant to implement an unlawful policy and then avoid ever having to bring to consequences an unlawful policy because they think, well, we have to determine why. Why was each meal been going through each and every line? Well, no, the presumption is the why was because you adopted the unlawful policy. And there are many ways you can address individual damage or it can be through special masters. It can be through submitted surveys. It can be through declarations submitted by class members. But that's already after we have determined that they implemented the unlawful policy. As several district courts have held, and almost all the California Court of Appeals courts have held, you have to look at why a meal break was missed, even in light of the fact that they were subject to an unlawful policy. That is going to render meal arrest rate claims categorically uncertifiable. I will note that in Brinkford, in Brinkford, the court only did rely on time records. They just looked at the policy. It said there wasn't a meal period policy. It was a rest break policy, and the rest break policy didn't include the proper language. It essentially wasn't providing the correct amount for rest breaks. In that case, it was certified. They were actually looking at the time records of the case. We actually distinguish it from this case where the court helped the court recognize that their rest break policy was unlawful, but said individual issues will predominate because we don't have any records on that. Now, that's not an issue on appeal, and that's not why we're here today, but that shows that the California courts and numerous district courts hold that it's the policy that you look at, it's that common clue that the policy that we will show and try was implemented that allows us to proceed collectively. I'm just about out of time, so if there are no further questions, I'll submit. You can cancel. Thank you. Thank you, Your Honors. Briefly, Mr. Richards said at first that the time records themselves, and he reported on some of them. I don't know who it is. They show violations. They've admitted in their papers that they don't show violations. The fact that somebody can take a break five hours to one minute into their shift under Brenker is not in and of itself a violation. It's precisely an individualized issue, and the nature of that individualized issue is evident from the record of this case. Excerpts of records 1523 through 33 contains 10 full pages of people who explained what their experiences were on second-hand breaks, the various reasons why they didn't want to take 30 minutes off the clock at the end of the day rather than staying on the clock, finishing up their work, going home to their families, and having dinner with their families. And it's perfectly reasonable and rational under Brenker and to shift the burden as they're trying to get out to the employer to demonstrate that those breaks, one-by-one, were in fact provided to the employees who, one, goes against Brenker, but it really turns the fiscality of Brenker really on its head. Two, Mr. Hickford said that the handbook itself are going to try the question of whether or not the effect followed it, but the district court, I'm the director of Forty College, specifically said that there was no evidence that it was, quote, implemented. And we know from Marlowe v. UPS, Wells Fargo, Vinole, and Ellis that a policy, something that's not implemented, cannot serve as evidence of the common clue to meet the class-orientation burden. Finally, he raised the question of premium pay. This court addressed that in Jenny Craig, which we submitted on a 28-J letter. So with that, I'll conclude. We ask the court to reverse the district court's decision with directions to deny class-orientation of the bridges. Thank you. Thank you, counsel. Mr. Hickford, are you going to be submitted for a decision?
judges: Fernandez, Thomas, Murguia